May it please the Court, my name is Steve Sandberg, Court-Appointed Pro Bono and Mukasey Curiae Counsel on behalf of Petitioners, Jusak Tori Lee, that's how it's pronounced, and Anastasia Jovita Shinta Indrayani. As this Court is undoubtedly aware, about two weeks after I filed my reply brief, the issue of this Court's ability to decide mixed questions of fact and law under Ramadan v. Gonzalez was definitively determined. That's when the Ramadan 1 panel issued its order, and that's also when a number of judges, including Judge Bea, issued their dissent for denial from the Petition for Rehearing en banc. The issue in this case, mainly in my mind, in addition to the other issues I briefed, is on changed circumstances. And Ramadan holds that this changed circumstances, as it's a mixed question of law and fact, can be decided by this Court. And I would draw the panel's attention to 8 CFR, section 1208.4, and this is the, these are the regulations defining what the changed circumstances are. Under A4, Romanet 2, the applicant shall file an asylum application within a reasonable period, given those changed circumstances. Now, there's no case law, this is a matter of first impression on what exactly a reasonable period is. There's an unpublished memorandum disposition on November 7th, where a panel discusses what a reasonable period is, but doesn't definitively decide what that means. In this case, the petitioners filed their application for asylum in August of 1999. And as this Court has noted in Sayal, and also in Lolong, the changed circumstances, 1998, amid all the civil unrest, that civil unrest continued through the year 2000. And the Lolong on Blanc panel noted that too. And I submit that the petitioner's application is filed within a reasonable time, given, as the regulations note, those changed circumstances. And there's a variety of types of changed circumstances. These ones are changes in the country of nationality, so in this case, in Indonesia. And therefore, that was primarily the only bar that the immigration judge cited for denying their application for asylum. In fact, the judge says in her decision that but for that change, the one-year asylum bar, and essentially counsels below, failure to even brief her, or argue that point, was the only thing that held her up from granting asylum. Now this Court has the ability to decide as a matter of law that the application was timely filed under the statutory exception that is more fully spelled out in the regulations that I've stated. Kennedy. Kennedy. So let me see if I understand you correctly. You're saying that, no question, that they didn't file their application for asylum timely under the one-year statute? Within one year of their arrival in the United States, no question. They arrived in 1992. You're saying that the situation in Indonesia changed during a period of time to make it more likely that they would be persecuted? Definitely. The Jusak Tori Lee is an ethnic Chinese Christian. So the situation is just exactly contrary to that, that things are getting better, not worse? At the time of their application, the judge denied it based on changed circumstances. So this Court can go back to the 1992 case. He denied the extension of the one-year period on the grounds that there were no changed circumstances? No. The judge actually – it's not clear that the immigration judge fully understood what the bar was. It talks about exceptional circumstances rather than changed or extraordinary circumstances. The issue was the judge said this – the changed circumstances had seemed to somehow read into the regulations an additional one-year time period. There was some comment about that they didn't file even within a year after May of 1998. The regulations don't state anything about that. The one-year bar is an asylum bar, but the changed circumstances, the statutory exception to that, allows for a petition to be filed and considered timely filed if it's filed, as the – as the regulation says, within a reasonable period given those changed circumstances. Now, those changed circumstances – But they didn't file within a year of getting here, did they? File within a year of getting what? Getting to the United States. They did not. Well, that's the end of it. No, that's not the end of it. Why? It would be the end of it if there were not a statutory exception to the one-year bar for asylum applications. Now, the changed circumstances are the 1998 riots, correct? Which continued through the year 2000 for the ethnic Chinese. And when do they file their application? August 25th, 1999, while those changed circumstances are still in effect. When did they arrive in the country? They arrived in 1992. But the changed circumstances don't start until 1998. And that statutory exception allows them then to file for it. They would otherwise be barred for it. If they, at that point – They've already been barred. They've already been barred. They were barred in 1993. No, no. That's not right. That's not – At least, as I understand the law is, if they're barred from filing for asylum because they missed the one-year bar, there's an exception to the bar if there are changed circumstances in the country that, in their view – and then they've got to persuade the DIJ, of course – make it much more likely or significantly more likely that they will, in fact, be persecuted. That allows them to reopen the time so that they can file for asylum, but they have to show changed conditions. But my understanding is that the I.J. here said, well, I'm not going to allow you to take advantage of that exception for changed conditions because you've waited for more than a year after the beginning of the riots. Now, why is the I.J. wrong to say that that's not a reasonable time? I understand it's not another year. It's a reasonable time. But he says that's more than a year after the changed conditions that you waited. Why is – I submit that that, now under Ramadan v. Gonzalez, which was decided after the briefing in this case, is a question for this Court to decide de novo. The facts are undisputed. The President Suharto resigned on May 21, 1998. The riots continued. The civil unrest, particularly against the ethnic Chinese Christians, continued well into the year 2000. So those are the changed circumstances. The time period of the filing for the application of asylum was August 25, 1999, during those changed circumstances. So I submit that this panel has the ability, now under Ramadan, to decide that those – that given those changed circumstances, which in this case were the Indonesian changed circumstances, that the application for asylum is within a reasonable time. Now, if they had waited to file until 2003 after conditions began to improve, I could see how that would be a different argument. What's the standard of review, if we have established that? Sometimes I have an idea of the answer, but here I simply do not. What's the standard of review that we apply in trying to decide whether the IJ or the BIA appropriately applied the word reasonable time? To be completely honest, I'm not exactly sure. My reading of Ramadan and the way that the panel decided that it had – that the Ninth Circuit has the ability to decide these mixed questions of law and fact, such as that they're not precluded by Section 106 of the Real ID Act, is more along the lines of a question of law, which this panel would decide de novo. How could you decide as a question of law what's reasonable? Isn't that a preternatural factual issue? That I'm not exactly sure. And under Ramadan, I don't know exactly how to sort that out for you either. Yeah. Okay. But that's the question that bothers me, not as to whether they had changed the conditions. They clearly did. But whether or not the filing was within a reasonable period and the sort of subpart of that question, the IJ holding that it's not a reasonable time, how much deference do we owe to that, or is it even reviewable? Right. And so – but since the regulations don't talk about a one-year bar anywhere, it's within the reasonable time. The reasonable time is what it is. And the language – the word I focus on mostly is that those changed circumstances. There's a variety of types of changed circumstances that could apply. In this case, it's undisputed the changed circumstances was the persecution against the ethnic Chinese Christians during this period of unrest that lasted for two, almost three years, particularly heavily. And their application was filed during that time, I submit, as a reasonable time. Wasn't the excuse given by this gentleman for not filing sooner that he didn't want to be disloyal to Indonesia? That's correct. That was the testimony. Let's hear from the government. We'll give you a chance to respond. May it please the Court, and I'll ask Ms. Schwartz for Respondent Mukasey. We're getting somewhere where we don't have any jurisdiction to go. They have never claimed that they were entitled to asylum. They waive that below. And counsel says that's because of incompetence of prior attorney. But first of all, in order to prevail in that argument, failing to apply for asylum would have to be per se ineffective in order for Petitioner to prevail, because as many cases as this Court has waived some of the requirements of Lozada, it hasn't waived all of them. And in this case, it was absolutely necessary to get a Lozada hearing, because Petitioner himself said that he had been advised by someone else that he couldn't get asylum. He also said that he came here and he didn't want to be a traitor to his country. He was told by an Indonesian lawyer, not Ms. Chang, who represented him below, that he would have a small chance. So he kept applying every year for the diversity visa. And then his brother came over, and then his sister came over, and then more than a year after they were granted asylum, that's when he filed his application for asylum. Ms. Chang did not represent him at that point. That representation came later, when he was put into – when his application was denied. He was put into proceedings, and then he hired Ms. Chang. So we don't get to any of these issues, because there has been – they haven't asked the Board for reopening, and they haven't claimed – made any basis for claim of ineffective assistance of counsel. They waived asylum below. So in order to get their asylum case considered, they have to do two things. They have to file a Rosada claim, they have to move to reopen, and they don't – what they have to overcome is not just established plausible eligibility for asylum, but plausible excuse for not having met the one-year bar. They are beyond one year. Now, again, there is no timeframe for when you can file an application within the time of changed circumstances. But it has been the routine that after the triggering event, in this case the riots of May of 88, judges have routinely given aliens in this country one year. And then if they go beyond the year, that's considered unreasonable. And Ramadan doesn't touch that. That is an unreviewable discretionary decision. I'm now interested in a different point. Okay. And that's the question as to whether or not the disfavored group analysis that I will say was applied in sale but, in fact, was announced in 1994 in the Quotaz case, if I'm pronouncing it correctly, and has been routinely applied to asylum cases. The Board says, well, but we're not going to apply it in removal cases. They make it pretty clear in their order. They don't like it anyway. In withholding, yes. But they'll follow – excuse me, I'm sorry. But they'll follow it with respect to asylum cases because they have to, even though they're kind of holding their nose and so doing. But they're not going to extend it to withholding of removal. And that is the Board's authority to do. Why is that so? That is, it seems to me that, although there's a much higher threshold, of course, for withholding of removal than for asylum. I understand that. But the underlying question that's being asked is likelihood of persecution. That's the same question. So why is it not simply a matter of just 2 plus 2 makes 4 to extend that same analysis, which is in both asylum and in withholding of removal, aimed at likelihood? Why don't we apply that same analysis? Because it's not the same analysis. It's a different burden of proof. It's a higher one for withholding. I just said that. That's correct. But the question you're asking is the same one. How likely is it? And, of course, withholding of removal, it has to be much more likely. But it's the same question, is how likely is it? Exactly. But the disfavored group is very discreet, and it only allows a slightly lower burden of proof for a greater form of relief. The Board has declined to extend it. Every circuit to the court. I'm sorry? Isn't the difference that the disfavored group analysis says that the more the group is disfavored, the less evidence of particularized persecution as to the individual is required? Yes. So it isn't a matter of burden of proof only. It's a matter of the type of proof, right? Yes. And what the Board has said, and within its authority, is that if you are applying for withholding, you apply under the same standards, and you don't get the benefit of a disfavored group analysis because it doesn't help you establish your clear entitlement. But this is not the case to decide it, Your Honor, because we don't get to it. Again, we have we haven't discussed the we're not there because of the ineffective assistance of counsel issue, the failure to seek reopening, the failure to challenge counsel's actions, and the failure to establish any plausible reason that they didn't file within one year. No, no, I'm sorry. You don't get to the asylum issue. I understand that argument. But I'm still talking about withholding of removal and the disfavored group analysis. You would say that the Board's decision, I don't think the Board has actually come out and said that we're not extending in a published decision. Oh, but they said it in this decision. They did. And that's why we're only asking for Skidmore difference. We don't get to Chevron deference because there isn't a published decision. But I would ask this Court to consider that every other Court to have addressed this issue has not only, most of them have absolutely decided not to follow the disfavored group analysis at all. Here's what bothers me about this case, and in a sense about Arceo and Cotas cases. They're putting into sort of abstract presumption sort of analysis forms something that's commonsensical, that is to say, and I'm now just kind of trying to paraphrase the Cotas opinion from 94. We know, and this is in the regulations of the Board, that if there's a pattern and practice of discrimination, which is a pretty high standard, all you've got to do is prove that you're a member of the group. So, for example, if you're in Nazi Germany in 1938, if you're a Jew, you qualify. Now, fair enough. But, of course, our common sense, and I'm now not trying to push upon you an agreement with the precise disfavored group analysis that the Sale case and the Cotas case do. If you're trying to figure out what the likelihood is of this individual being persecuted, well, figure out, okay, what group is this person a part of? Is it a religious group? Is it an ethnic group? And so on, a political group. Well, it, of course, stands to reason that to the degree that there's strong feeling against that group in that society, the chances of that person suffering go up a little bit. Now, that's just common sense, and it seems to me that the only thing that Cotas and Sale did was to sort of put this into formalistic sort of presumption forms. What am I missing here? No, you're absolutely right, but it's sort of boxing in the agency and affecting what factors it can consider in its discretion. It's going on beyond the nature of the statute. If – I don't know if it will help, but the history of a particular social group came after World War II when the Gypsies, the Roma, were being persecuted as badly as the Jews, but they weren't a recognizable group. It wasn't religion. It wasn't politics. And that's where the disfavored group came from, readily identifiable group. And from this, that's how we get a particular social group. In this case, even under the standards, this petitioner has less than Sale had and less than Lalonde had. He hasn't been in the country for about 15 years. He hadn't been in the country for – I'm not accurate. You want a policy issue? I'm trying to figure out the question as to whether or not we should, if this is even the right word, extend Sale and Cotas to the withholding and removal, without regard to the facts of this case. This case is a little weak, it seems to me. Absolutely not, because then you're boxing in the administrative agency as to what it can do beyond what the statute – beyond the limits the statute places. But once we've got Sale, why is it logical to stop with Asylum? That's to say, I think your objection goes to Sale. I understand it perfectly. And were I in your position, I'd think that's a pretty good objection to Sale. But now that we've got Sale on the books with Asylum, I don't understand why it doesn't apply, because we're asking the same darn question. It is the same question. But again, it's the showing that's necessary. The government believes that the less particular – I'm sorry. The less particularized showing required for Asylum does not apply to withholding, which is an entitlement. It's not an – it's a temporary thing. And you are entitled to it if you qualify. Asylum is a different form of relief and a different standard. And it is – you got it? I don't agree that that's the distinction, but I understand the distinction. But you understand the government's position. Do you want to discuss it all being an effective assistance of counsel problem? Because that was the main issue here. I don't see how we can get to that, because they haven't raised it below. This Court has waived parts of Lozada, but not all of Lozada. And why it's so important here to have a Lozada compliance is because the evidence here shows that he didn't want to apply for Asylum. He was here for eight years before he applied. And even after a year, when his brothers and sisters were all traipsing in with Asylum, his mother just got her green card and she's living with him. And then he may have instructed his attorney not to pursue Asylum. And he – this may have happened in combination with what the Indonesian lawyer told him. And after the immigration judge's warning about a frivolous Asylum claim, it may have been his choice. And that's why Lozada is important here, because he's blaming the attorney and we don't know if it wasn't at his direction. Plus the fact you can't – You're over time, so unless the bench has further questions, you've got a sentence or so to wrap up. Well, he has not made a claim for withholding and there's no basis to revisit the Asylum claim, either through effective assistance of counsel, which we could only reach if we ever made a plausible claim for extending the one-year bar. Thank you. Response? Thank you, Your Honors. Let me ask you right away. Why didn't the – why isn't the Asylum claim waived in the brief to the BIA? The brief to the BIA, as I submit – as Your Honors are well aware, I came on board at this point in the proceedings. I submit that it was not waived in the brief to the BIA because the issue was raised and argued. In the brief on page 7, it says the bar applies. Why isn't – Excuse me? In the brief to the BIA on page 7 of the record, it says the bar applies. I submit that that's extreme and effective assistance of counsel. All right. But you can't attack – can you in this proceeding? Have you made that an issue before us? Yes, I think we can. And for the reasons I argued in my brief. Have you made it an issue on appeal of the Ninth Circuit? Yes. That counsel was ineffective? Yes. And on – on remand, I submit this panel can grant the petition and in its discretion remand and ask that the Lozada requirements be met. There's no – no problem with doing that. In fact, I think that would be a fair thing to require. But where in your brief is the ineffective assistance claim raised? In my brief? Yes. It's the first argument I make. What page is that? In my brief, my argument begins on page 10, that the petitioners were prejudiced by ineffective assistance of counsel, and it goes through page 17. And my second argument is the one that Judge Fletcher alluded to earlier, which is that there's no logical or analytical reason why an analysis of persecution should not apply both to asylum and to withholding of removal. As I argued in my brief, the reason it didn't apply in Sayle was simply because a withholding of removal claim was not before the court. Is there any case in which we don't require that matter of Lozada be complied with before it gets to us or before it gets – or be made first to the board? I'm unfamiliar with a case in which we say, well, assuming you can qualify for matter of Lozada, and we'll remand it in order for that to happen. Although, cases I've seen, it's always matter of Lozada goes before the board first, and then we get it. I'm not positive on that, Your Honor. Any further questions from the panel? Thank you. Thank both of you. And were you here pro bono? Yes. Yes, and thank – and we thank not only you, but all of you who do this pro bono. We appreciate it very much, as does the government. Thank you. Thank you. The case of Lee v. MacKenzie is submitted. The next case is Ang.
judges: Noonan, W. Fletcher, Bea